MORRISON ET AL. *v.* CALIFORNIA.

.No. 487.   Argued December 12, 13, 1933.—Decided January 8, 1934.

Mr. J. *Marion Wright* for appellants.

Mr. *James S. Howie,* Deputy Attorney General of California, with whom Mr. *U. S. Webb,* Attorney General, was on the brief, for appellee.

MR. JUSTICE CARDOZO delivered the opinion of the Court.

The appellants have been convicted of a conspiracy to violate the Alien Land Law of the State of California.

The indictment charges that the two appellants, Morrison and Doi, feloniously conspired to place Doi in the possession and enjoyment of agricultural land within the state; that possession was obtained, and the land used and cultivated, in execution of the conspiracy; and that Doi was an alien Japanese, ineligible to citizenship, and not protected in his possession by any treaty between the Government of the United States and the Government of Japan. These acts, if committed with the guilty knowledge of each defendant, make out a criminal conspiracy under the statutes of the state.

84

On the trial the state proved that Doi had gone upon the land and used it under an agreement with Morrison, but did not attempt to prove that he was not a citizen of the United States or that he was ineligible for citizenship. The statutes of California provide that as to these elements of the crime the burden of disproving guilt shall rest on a defendant. By § 9a of the Alien Land Law as amended in 1927 (California Statutes, 1927, p. 880, c. 528), it is enacted that " in any action or proceeding, civil or criminal, by the State of California, or the people thereof, under any provisions of this act, when the proof introduced by the state, or the people thereof, establishes the acquisition, possession, enjoyment, use, cultivation, occupation, or transferring of real property or any interest therein, or the having in whole or in part the beneficial use thereof by any defendant, or any of such fact(s), and the complaint, indictment or information alleges the alienage or ineligibility to United States citizenship of such defendant, the burden of proving citizenship or eligibility to citizenship shall thereupon devolve upon such defendant." At the same session of the legislature, the Code of Civil Procedure of the state was amended by the addition of a new section (1983) which in substance and effect restates the same rule. California Statutes, 1927, p. 434, c. 244. Applying these statutes to this case, the trial judge held (a jury having been waived) that both the defendants, Morrison as well as Doi, were guilty of conspiracy. They were sentenced to be imprisoned for two years, but the sentences were suspended, and the defendants placed upon probation. There was an appeal to the District Court of Appeal for the Fourth District, where the judgment was affirmed. The court overruled the defendants' contention that by the application of § 9a of the Alien Land Law and § 1983 of the Code of Civil Procedure, there had been a denial of due process

of law under the Fourteenth Amendment of the Constitution of the United States. 13 P. (2d) 803. The cause was then transferred to the Supreme Court of California. There defendants' contention under the Fourteenth Amendment was again overruled, and the conviction was affirmed, three judges dissenting. 218 Cal. 287; 22 P. (2d) 718. An appeal to this court followed.

A person of the Japanese race is a citizen of the United States if he was born within the United States. *United States* v. *Wong Kim Ark*, 169 U.S. 649. He is a citizen, even though born abroad, if his father was a citizen, pro-vided, however, that this privilege shall not exist unless the father was at some time a resident of the United States as well as a citizen, and provided also that such a child, who continues to reside abroad, shall, in order to receive the protection of this Government, be required upon reaching the age of eighteen years to record at an American consulate his intention to become a resident and remain a citizen of the United States, and shall be further required to take the oath of allegiance to the United States upon attaining his majority. R.S. § 1993; 8 U.S.C. § 6; *Weedin* v. *Chin Bow*, 274 U.S. 657; see also R.S. § 2172; 8 U.S.C. § 7. But a person of the Japanese race, if not born a citizen, is ineligible to become a citizen, i.e., to be naturalized. The privilege of naturalization is confined to aliens who are " free white persons, and to aliens of African nativity and to persons of African descent." R.S. § 2169; 8 U.S.C. § 359. " White persons " within the meaning of the statute are members of the Caucasian race, as Caucasian is defined in the understanding of the mass of men. *Ozawa* v. *United States*, 260 U.S. 178; *Yamashita* v. *United States*, 260 U.S. 199; *United States* v. *Thind*, 261 U.S. 204, 214; *Terrace* v. *Thompson*, 263 U.S. 197; *Porterfield* v. *Webb*, 263 U.S. 225; *Webb* v. *O'Brien*, 263 U.S. 313; *Cockrill* v. *California*, 268 U.S. 258. The term

excludes the Chinese (*United States* v. *Wong Kim Ark, supra;* 8 U.S.C. § 363), the Japanese (cases *supra*), the Hindus (*United States* v. *Thind, supra*), the American Indians (*Ozawa* v. *United States, supra*) and the Filipinos (*Toyota* v. *United States,* 268 U.S. 402), though Indians and Filipinos who have done military or naval service may be entitled to special privileges (8. U.S.C. §§ 3, 388). Nor is the range of the exclusion limited to persons of the full blood. The privilege of naturalization is denied to all who are not white (unless the applicants are of African nativity or African descent) ; and men are not white if the strain of colored blood in them is a half or a quarter, or, not improbably, even less, the governing test always (*United States* v. *Thind, supra*) being that of common understanding. *Dean* v. *Commonwealth,* 4 Gratt. (45 Va.) 541; *Gentry* v. *McMinnis,* 3 Dana (Ky.) 382; *In re Camille,* 6 Fed. 256; *In re Young,* 198 Fed. 715, 717; *In re Lampitoe,* 232 Fed. 382; *In re Alverto,* 198 Fed. 688; *In re Knight,* 171 Fed. 299; 2 Kent Comm. (12th ed.) 73, note. Cf. the decisions in the days of slavery: *Gentry* v. *McMinnis,* 3 Dana (Ky.) 382; *Morrison* v. *White,* 16 La. Ann. 100, 102; see *Scott* v. *Raub,* 88 Va. 721, 727–9; 14 S.E. 178.[1]

The California Land Law must be read in the light of these rulings as to the effect of birth and race. Section 1 of the Act (Cal. Stat. 1923, p. 1020, amending Cal. Stat. 1921, p. lxxxiii) provides that all aliens eligible for citizenship may acquire and occupy real property to the same extent as citizens. Section 2 provides that aliens not eligible for citizenship may use and occupy real property to the extent prescribed by any treaty between the Government of the United States and the nation or country of which such alien is a citizen or subject, " and not

---

[1] The opinions in *Jeffries* v. *Ankeny,* 11 Ohio 372, and *Gray* v. *State,* 4 *id.* 353, rest upon peculiar provisions of the Ohio Constitution.

otherwise." There is a treaty between the United States and Japan (37 Stat. 1504) by which the Japanese may own or lease houses, manufactories, warehouses, and shops, and may lease land for residential and commercial purposes. The treaty does not confer a privilege to own or use land for the purposes of agriculture. *Webb* v. *O'Brien, supra,* p. 323; *Frick* v. *Webb,* 263 U.S. 326. Section 3 of the Act prescribes the rule applicable to the acquisition of shares in corporations organized by aliens for the occupation or use of land; §§ 4 and 5 prescribe the rule for alien trustees and guardians; §§ 7, 8, and 9 provide for the escheat to the state of any interest in real property unlawfully acquired. Section 10 provides that " if two or more persons conspire to violate any of the provisions of this act they are punishable by imprisonment in the county jail or state penitentiary not exceeding two years or by a fine not exceeding five thousand dollars, or both." This is the section under which the defendants have been convicted. There is nothing in the statute whereby unlawful occupation of land by an alien ineligible for citizenship is declared to be a crime unless the occupation has been acquired by force of a conspiracy.

This court in *Morrison* v. *California,* 288 U.S. 591,[2] passed upon a controversy as to the validity of § 9b of the California Land Law, which, though akin to § 9a, has important elements of difference. This section (9b) provides in substance that when it has been proved that the defendant has been in the use or occupation of real property and when it has also been proved that he is a member of a race ineligible for citizenship under the naturalization laws of the United States, the defendant shall have

---

[2] The appeal was dismissed for the want of a substantial federal question upon a statement as to jurisdiction, and without argument of counsel.

the burden of proving citizenship as a defense.[3]  We sustained that enactment when challenged as invalid under the Fourteenth Amendment of the federal constitution. The state had given evidence with reference to the defendant, the occupant of the land, that by reason of his race he was ineligible to be made a citizen. With this evidence present, we held that the burden was his to show that by reason of his birth he was a citizen already, and thus to bring himself within a rule which has the effect of an exception. In the vast majority of cases, he could do this without trouble if his claim of citizenship was honest. The People, on the other hand, if forced to disprove his claim, would be relatively helpless. In all likelihood his life history would be known only to himself and at times to relatives or intimates unwilling to speak against him.

The ruling was not novel. The decisions are manifold that within limits of reason and fairness the burden of proof may be lifted from the state in criminal prosecutions and cast on a defendant. The limits are in substance these, that the state shall have proved enough to make it just for the defendant to be required to repel what

[3] Sec. 9b: In any action or proceeding, civil or criminal, by the State of California, or the people thereof, under any of the provisions of this act, when the complaint, indictment or information, alleges the alienage and ineligibility to United States citizenship of any defendant, proof by the state, or the people thereof, of the acquisition, possession, enjoyment, use, cultivation, occupation or transferring of real property or any interest therein, or the having in whole or in part of the beneficial use thereof by such defendant, or of any such facts, and in addition proof that such defendant is a member of a race ineligible to citizenship under the naturalization laws of the United States, shall create a prima facie presumption of the ineligibility to citizenship of such defendant, and the burden of proving citizenship or eligibility to citizenship as a defense to any such action or proceeding shall thereupon devolve upon such defendant. Cal. Stats. 1927, c. 528, p. 881.

has been proved with excuse or explanation, or at least that upon a balancing of convenience or of the opportunities for knowledge the shifting of the burden will be found to be an aid to the accuser without subjecting the accused to hardship or oppression. Cf. Wigmore, Evidence, Vol. 5, §§ 2486, 2512 and cases cited. Special reasons are at hand to make the change permissible when citizenship *vel non* is the issue to be determined. Citizenship is a privilege not due of common right. One who lays claim to it as his, and does this in justification or excuse of an act otherwise illegal, may fairly be called upon to prove his title good. In accord with that view are decisions of this court in proceedings under the acts of Congress for the deportation of aliens. A Chinaman by race resisted deportation on the ground that, though a Chinaman, he had been born in the United States. The ruling was that as to the place of birth the burden was upon the alien, and not upon the Government. The ruling also was that the imposition of that burden did not deprive the alien of his constitutional immunities. *Chin Bak Kan* v. *United States,* 186 U.S. 193, 200. " The inestimable heritage of citizenship is not to be conceded to those who seek to avail themselves of it under pressure of a particular exigency, without being able to show that it was ever possessed." *Ibid.* See also: *Ah How* v. *United States,* 193 U.S. 65, 76; *Christy* v. *Leong Don,* 5 F. (2d) 135. Cf. *Ng Fung Ho* v. *White,* 259 U.S. 276, 283. We adhered to that principle in *Morrison* v. *California, supra.* Upon that basis, we approved the ruling of the Supreme Court of California (*People* v. *Osaki,* 209 Cal. 169; 286 Pac. 1025) that § 9b of the Alien Land Law casting upon a Japanese defendant the burden of proving citizenship after proof of his race had been given by the state was not an impairment of his immunities under the federal constitution. No point was made in the statement of jurisdiction or the supporting brief that

the crime was conspiracy and that one of the defendants belonged to the white race. The case was submitted as if both were Japanese.

The question is now as to § 9a. Obviously there is a wide difference between the scope of the two sections. Possession of agricultural land by one not shown to be ineligible for citizenship is an act that carries with it not even a hint of criminality. To prove such possession without more is to take hardly a step forward in support of an indictment. No such probability of wrongdoing grows out of the naked fact of use or occupation as to awaken a belief that the user or occupier is guilty if he fails to come forward with excuse or explanation. *Yee Hem* v. *United States,* 268 U.S. 178, 183, 184; *Luria* v. *United States,* 231 U.S. 9, 25; *Casey* v. *United States,* 276 U.S. 413, 418; *Mobile, J. K. & C. R. Co.* v. *Turnipseed,* 219 U.S. 35, 42, 43; *Bailey* v. *Alabama,* 219 U.S. 219, 233, 238; *Manley* v. *Georgia,* 279 U.S. 1; *People* v. *Cannon,* 139 N.Y. 32. "The legislature may go a good way in raising [a presumption] or in changing the burden of proof, but there are limits." *McFarland* v. *American Sugar Co.,* 241 U.S. 79, 86. What is proved must be so related to what is inferred in the case of a true presumption as to be at least a warning signal according to the teachings of experience. "It is not within the province of a legislature to declare an individual guilty or presumptively guilty of a crime." *McFarland* v. *American Sugar Co., supra; Bailey* v. *Alabama, supra; Manley* v. *Georgia, supra.* There are, indeed, "presumptions that are not evidence in a proper sense but simply regulations of the burden of proof." *Casey* v. *United States, supra.* Even so, the occasions that justify regulations of the one order have a kinship, if nothing more, to those that justify the others. For a transfer of the burden, experience must teach that the evidence held to be inculpatory has at least a sinister significance (*Yee Hem* v. *United States, supra; Casey* v.

*United States, supra*), or if this at times be lacking, there must be in any event a manifest disparity in convenience of proof and opportunity for knowledge, as, for instance, where a general prohibition is applicable to every one who is unable to bring himself within the range of an exception. Greenleaf, Evidence, Vol. 1, § 79.[4] The list is not exhaustive. Other instances may have arisen or may develop in the future where the balance of convenience can be redressed without oppression to the defendant through the same procedural expedient. The decisive considerations are too variable, too much distinctions of degree, too dependent in last analysis upon a common sense estimate of fairness or of facilities of proof, to be crowded into a formula. One can do no more than adumbrate them; sharper definition must await the specific case as it arises.

We turn to this statute and endeavor to assign it to its class. In the law of California there is no general prohibition of the use of agricultural lands by aliens, with special or limited provisos or exceptions. To the contrary, it is the privilege that is general, and only the prohibition that is limited and special. Without preliminary

---

[4] Instances of the application of this principle can be cited in profusion. The cases that follow are typical examples: *King* v. *Turner*, 5 Mau. & Sel. 206, where a defendant having game in his possession in violation of a statute whereby possession was generally a crime, was held to have the burden of proving his special qualifications (cf. *Yee Hem* v. *United States, supra;* also *Spieres* v. *Parker*, 1 T.R. 144, per Lord Mansfield); *Fleming* v. *People*, 27 N.Y. 329, a prosecution for bigamy, where on proof that the defendant had contracted a second marriage during the lifetime of his first wife, the burden was laid upon him to prove exceptional circumstances that would have made the marriage lawful; and finally such cases as *Potter* v. *Deyo*, 19 Wend. 361, 363, and *United States* v. *Turner*, 266 Fed. 248 (typical of a host of others) where a defendant has been subjected to the burden of producing a license or a permit for a business or profession that would otherwise be illegal. Cf. *United States* v. *Hayward*, 26 Fed. Cas. 240; *Board of Comm'rs* v. *Merchant*, 103 N.Y. 143; 8 N.E. 484.

92

proof of race, occupation of the land is not even a suspicious circumstance. The inquiry. must therefore be whether occupants so situated may be charged with the burden of proving themselves eligible and thus establishing their innocence.

*First.* The indictment is for conspiracy, and, indeed, the Alien Land Act creates no other crime. *In re Akado,* 188 Cal. 739, 742; 207 Pac. 245; *Mott v. Cline,* 200 Cal. 434, 448; 253 Pac. 718; *California Delta Farms* v. *Chinese American Farms,* 207 Cal. 298, 308; 278 Pac. 227. Morrison and Doi are charged to have conspired, but Doi alone is charged to be ineligible for citizenship. One might suppose from a reading of the statute that the burden of proof, even if shifted as to him, would be unaffected as to Morrison. The California courts, however, have cast the same burden upon both; and both have been convicted. None the less, in applying the presumption, we must keep before us steadily the quality of their crime. It is impossible in the nature of things for a man to conspire with himself. *Turinetti* v. *United States,* 2 F. (2d) 15, 17. In California as elsewhere conspiracy imports a corrupt agreement between not less than two with guilty knowledge on the part of each. *People* v. *Richards,* 67 Cal. 412; 7 Pac. 828; *People* v. *Kizer,* 22 Cal. App. 10, 14; 133 Pac. 516, 521; 134 *id.* 346; *People* v. *Entriken,* 106 Cal. App. 29, 32; 288 Pac. 788; *Sands* v. *Commonwealth,* 21 Gratt. (Va.) 871, 899; *Pettibone* v. *United States,* 148 U.S. 197, 203, 205.

Now, plainly as to Morrison, an imputation of knowledge is a wholly arbitrary presumption. He may never have seen Doi before the transfer of possession or afterwards. He may have made his agreement by an agent or over the telephone or by writings delivered through the mails. Even if lessor and lessee came together face to face, there is nothing to show whether Doi was a Japanese of the full blood, whose race would have been appar-

ent to any one looking at him. Moreover, if his race was apparent, he may still have been a citizen, for anything that was known to Morrison or others. The statute does not make it a crime to put a lessee into possession without knowledge or inquiry as to race and place of birth. The statute makes it a crime to put an ineligible lessee into possession as the result of a wilful conspiracy to violate the law. Nothing in the People's evidence gives support to the inference that Morrison had knowledge of the disqualifications of his tenant or could testify about them. What was known to him, so far as the evidence discloses, was known also to the People, and provable with equal ease. Only an arbitrary mandate could charge him with guilty knowledge as an inference of law if it were proved that Doi was not a citizen or eligible to become one. Still less can he be charged with such knowledge when Doi's disqualification is itself a mere presumption. In such circumstances the conviction of Morrison because he failed to assume the burden of disproving a conspiracy was a denial of due process that vitiates the judgment as to him. Nor is that the only consequence. Doi was not a conspirator, however guilty his own state of mind, unless Morrison had shared in the guilty knowledge and design. *Pettibone* v. *United States, supra; Gebardi* v. *United States,* 287 U.S. 112, 123. The joinder was something to be proved, for it was of the essence of the crime. Without it there was a civil wrong, but not a criminal conspiracy, the only crime denounced. *In re Akado, supra.* The conviction failing as to the one defendant must fail as to the other. *Turinetti* v. *United States, supra; Williams* v. *United States,* 282 Fed. 481, 484; *Gebardi* v. *United States, supra.*

*Second.* The result will not be changed if we view the case on the assumption that possession by one ineligible, when it is the product of agreement, may be criminal as to the tenant who holds with guilty knowledge, though

innocent as to the landlord who believes that all is lawful.

We have pointed out before that a lease of agricultural land, unaccompanied by evidence of the race of the lessee, conveys no hint of criminality. For the moment we assume, without intending tò decide, that strong considerations of convenience, if they existed, might cast upon the tenant the burden of proving his qualifications and thus disproving guilt. The question will then be whether the normal burden of proof will so thwart or hamper justice as to create a practical necessity, without preponderating hardship to the defendant, for a departure from the usual rule.

In the vast majority of cases the race of a Japanese or a Chinaman will be known to any one who looks at him. There is no practical necessity in such circumstances for shifting the burden to the defendant. Not only is there no necessity; there is only a faint promotion òf procedural convenience. The triers of the facts will look upon the defendant sitting in the court room and will draw their own conclusions. If more than this is necessary, the People may call witnesses familiar with the characteristics of the race, who will state his racial origin. The only situation in which the shifting of the burden can be of any substantial profit to the state is where the defendant is of mixed blood, the white or the African so preponderating that there will be no external evidence of another. But in such circumstances the promotion of convenience from the point of view of the prosecution will be outweighed by the probability of injustice to the accused. One whose racial origins are so blended as to be not discoverable at sight will often be unaware of them. If he can state nothing but his ignorance, he has not sustained the burden of proving eligibility, and must stand condemned of crime.

Reflection will satisfy that the chance of this injustice is not remote or shadowy. Let us assume a charge that

agricultural land has been occupied by Filipinos not born in the United States, and not entitled to the privileges growing out of service in the army or the navy. 8 U.S.C. § 388. They are then ineligible for citizenship, and subject to indictment under the laws of California if they have gone into possession in aid of a conspiracy. But Filipinos have intermarried with many other peoples. They have intermarried with whites and with Negroes and mulattoes. A laborer, born in Canada, his parents apparently mulattoes, but one of his grandparents a Filipino, according to the charge in an indictment, would be ignorant in many cases whether he was a Filipino or an African. The admixture of oriental blood might be too slight for his race to be apparent to the eye, and family traditions are not always well preserved, especially when the descendants are men and women of humble origin, remote from kith and kin. The same possibility of injustice would be present where the occupant of the land is a descendant of Mexicans and Indians,[5]

---

[5] Indians not born in the United States and not entitled to the special privileges growing out of service in the war (8 U.S.C. § 3) are ineligible for citizenship.

There is a strain of Indian blood in many of the inhabitants of Mexico as well as in the peoples of Central and South America. Robert F. Foerster, The Racial Problems involved in Immigration from Latin America and the West Indies to the United States, Report to Secretary of Labor, 1925, pp. 7, 10, 15, 17, 18, 21, 22, 23, 24, 28, 29, 41.

Whether persons of such descent may be naturalized in the United States is still an unsettled question.

The subject was considered in *Matter of Rodriguez,* 81 Fed. 337, but not all that was there said is consistent with later decisions of this court. *Ozawa* v. *United States,* and *United States* v. *Thind, supra.* Cf, *In re Camille, supra.*

Mexicans have migrated into California in increasingly large numbers (T. F. Woofter, Jr., Status of Racial and Ethnic Groups in "Recent Social Trends," Vol. 1, pp. 553, 562, 572, 573); and there have developed racial problems which have been considered by official

or an Eurasian, his ancestors partly Europeans and partly Asiatics.[6]

The probability is thus apparent that the transfer of the burden may result in grave injustice in the only class of cases in which it will be of any practical importance. The statute does not say that the defendant shall be acquitted if he does not know his racial origin and is unable to make proof of it. What the effect of such a law would be, we are not required to consider. To the contrary, the statute says in substance that unless he can and does prove it, he will have failed to discharge his burden, and will therefore be found guilty. Moreover, if he were to profess ignorance, and ignorance were an excuse, the trier of the facts might refuse to credit him. Holmes, J., in *Ah How* v. *United States, supra,* p. 76. There can be no escape from hardship and injustice, outweighing many times any procedural convenience, unless the burden of persuasion in respect of racial origin is cast upon the People.

What has been written applies only to those provisions of the statute that prescribe the rule for criminal causes.

---

bodies. California Departments of Industrial Relations, Agriculture and Social Welfare, "Mexicans in Californa," Report by Governor C. C. Young's Mexican Fact Finding Committee, San Francisco, Cal., 1930, pp. 41, *et seq.*.

The treaty of Amity, Commerce, and Navigation of 1831 between the United States and Mexico gives to the nationals of either country the privilege of owning personal estate in the other (Art. XIII), but contains no provision in respect of the ownership of land. This treaty was revived after the Mexican War by Article XVII of the Treaty of Guadalupe Hidalgo (1848). It was terminated by Mexico in November, 1881. See Malloy, Treaties, Vol. 1, p. 1085.

[6] As to the appearance of children of marriages between Japanese and the white races, see: S. C. Gulick, The American Japanese Problem, p. 153; Iyenaga and Sato, Japan and the California Problem, p. 157.

Other considerations may or may not apply where the controversy is civil. We leave that question open.

The judgment is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

*Reversed.*